Michael ALLEY, et al., Plaintiffs,

v.

RESOLUTION TRUST CORPORATION,
Defendant.

Margaret E. ARISTEGUIETA,
et al., Plaintiffs,

v.

RESOLUTION TRUST CORPORATION,
Defendant.

Civ. A. Nos. 91–0166, 91–0220.

United States District Court,
District of Columbia.

March 23, 1992.

Christopher B. Little, Alper & Mann, Washington, D.C. for Michael Alley and Margaret Elizabeth Aristeguieta.

Paul Ridley, Hopkins & Sutter, Dallas, Tex. for Resolution Trust Corp.

## MEMORANDUM AND OPINION

REVERCOMB, District Judge.

The 48 plaintiffs in these two actions are former employees of the now defunct Federal Asset Disposition Association (FADA). FADA was a federally chartered savings association whose stock was wholly owned by the former Federal Savings and Loan Insurance Corporation (FSLIC) and whose sole function was to dispose of the assets of failed FSLIC insured thrift institutions. The 28 *Aristeguieta* plaintiffs worked in FADA's Atlanta and Los Angeles offices, while the 20 *Alley* plaintiffs worked in Denver. The defendant, Resolution Trust Corporation, has been receiver for FADA since February 5, 1990, pursuant to FSLIC's abolition and FADA's liquidation under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA).

The gravamen of all plaintiffs' complaints is that they have been denied payments allegedly due them under FADA's Reduction in Force and Separation Pay policy (Severance Plan) dated May 3, 1988, and its Employee Retention Plan dated Septem-

ber 29, 1988, as amended on May 2, 1989 (Retention Plan). The *Aristeguieta* plaintiffs assert common law breach of contract, breach of fiduciary duty and promissory estoppel claims, in addition to seeking relief for statutory violations of the California and Georgia labor codes; the *Alley* plaintiffs assert comparable common law claims and a violation of the Colorado wage code. Both actions are before this Court under 28 U.S.C. § 1331 and FIRREA 12 U.S.C. § 1821(d)(6)(A).

Defendant RTC has moved for summary judgment on grounds that all of plaintiffs' state law causes of action are preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1140 *et seq.* (ERISA), which Courts have held to regulate exclusively the type of unfunded employee plans at issue in this case, and because the plans were not government employee plans exempted from ERISA.[1] Neither complaint seeks relief under ERISA. The Court heard oral argument on summary judgment from all parties on February 28, 1992. For the reasons set forth below, the Court agrees with the defendant's argument and grants summary judgment in its favor.

*The Plans*

Plaintiffs argue that FADA's plans are not preempted by ERISA because, while traditional severance plans are among the employee retirement and welfare benefits governed by 29 U.S.C. § 1002(2)(A)(i) and (ii), "the intent and purpose of [FADA's] benefits were *not* to cover a possible period of unemployment after job loss, ... [but rather to] provide an incentive to *keep* employees on the payroll in the face of a difficult and negative work environment." Aristeguieta Opp. at 9; *see also* Alley Opp. at 7–8. The defendant counters that plaintiffs make a distinction without a difference, since "the very mechanism by which the retention plan allegedly induced Plaintiffs to remain at FADA was to provide them with income security in the event of a

layoff or job termination." RTC Reply at 3.

The undisputed facts and exhibits show that the FADA plans at issue arose as follows. FADA's management issued Personnel Policy No. 820 on May 3, 1988. By its own terms, Policy No. 820 provided from two to eight weeks of "separation pay" for an employee leaving FADA due to "work force reductions or job eliminations," but not for voluntary termination unless it occurred "after receipt of formal notice that his or her job will be eliminated" or as a result of the employee being "directed to work in a new geographic location over fifty miles distance from present work location." Complaint, Exhibit B. On June 21, 1988, FADA's board of directors adopted a resolution supplementing Policy No. 820 by providing a "program of severance benefits ... to all employees of FADA who remain in the employ of FADA through the date of ... termination" of FADA's charter. The supplemental benefits included a lump-sum severance payment equal to four months of salary and prepayment of four months of major medical insurance. Among other things, the resolution provided that

> immediately prior to the date of termination, the Association shall deposit into an irrevocable escrow account ... sufficient funds to pay the obligations of the Association to its employees under the severance plan.

It also authorized the FADA's officers to implement the severance policies and "to take such other actions in furtherance of the foregoing resolutions as they deem necessary," and it directed that the severance policy be disclosed, filed, and distributed "in compliance with ERISA procedures." RTC Appendix Tab 4 at 10–12.

On September 29, 1988, FADA management issued an addendum to Policy No. 820 entitled "Employee Retention Plan." The addendum is materially identical to the June 21, 1988, board resolution and stated as its "Purpose" that

---

1. The *Alley* plaintiffs also move for partial summary judgment on their contact claims based on

Colorado law.

[a]n Employee **Retention Plan,** with the appropriate incentives, **will provide assurance to personnel that** if proposed legislation is successful and FADA's charter is withdrawn, **they will have a reasonable opportunity, with income, to pursue other gainful employment.** The plan's objective is to ensure that FADA will retain the services of its employee base and not lose personnel through attrition because of justifiable concerns about the dissolution of FADA.

Complaint Exhibit A (emphasis added). As RTC points out, the addendum refers to FADA's "severance policy" and "severance benefit" eight times in two pages, while using the term "Retention Plan" only twice. The plaintiffs base their claim of entitlement to four months of severance pay and medical benefits primarily on this addendum.

On May 2, 1989, FADA's board of directors passed a second resolution stating that

the Resolution ... of June 21, 1988 regarding Severance Benefits is ratified and affirmed ... with the following changes and additions ...:

(a) **Notwithstanding any provision of the June 21, 1988 Resolution to the contrary,** any Covered Employee who, ... is given notice of termination of employment by FADA, for any reason other than for cause, shall be entitled to Severance Benefits ...,; *provided however,* that **no Severance benefits shall be payable pursuant to this subparagraph if, prior to giving of notice of termination of employment to FADA, (i) a Sale shall have occurred and (ii) the Successor shall have made a Comparable Offer of Employment to such employee.**

RTC Appendix Tab 3 at 6–7 (emphasis added). The resolution defines the terms "sale" and "successor" quite broadly[2], re-

flecting the board's concern as stated in its minutes that

the environment being faced by the employees today is different from that was in existence in the summer of 1988 when very specific legislation respecting only FADA had been introduced.... Conditions today are much more uncertain, and the Resolution of the Board of June 21, 1988 is not, standing alone, sufficient protection for the employees of FADA....

*Id.* at 6–9. "Comparable offer of employment" is defined as

a written offer to employ a FADA employee in a position comparable in stature and duties to such employee's position at FADA, **at a salary not less than 85% of such employee's salary at FADA ... and at a location not more than 150 miles distant....**

*Id.* at 9.

Pursuant to the board's May 2, 1989, resolution, FADA's management issued a second addendum to Policy No. 820. RTC states without contradiction from plaintiffs that this second addendum

is textually different and materially inconsistent with the May 2, 1989, [board] resolution. The principal, though not only, changes are the Addendum's deletions of the language *"Notwithstanding any provision of the June 21, 1988 Resolution to the contrary"* ... at the beginning of the critical paragraphs ... of the resolution; deletion of the reference to the June 21, 1988 Resolution in paragraph (f) [which stated that neither the 6/21/88 nor 5/2/89 board resolution were intended to change interpretation of Policy No. 820]; and addition of a statement to paragraph (f) that the Addendum *was not* intended "to change the application or interpretation of ... the [9/29/88] Addendum," which the preceding language [of the board's 5/2/89 reso-

---

**2.** "Sale" *is defined as meaning any one of four things:* (1) any change in beneficial ownership of more than 50 percent of FADA's capital stock, (2) any transfer of the right to appoint or elect a majority of FADA's directors, (3) any merger or consolidation of FADA with any other entity, *or* (4) any transaction approved by FADA's board

in which a single entity shall have made comparable offers of employment to 85 percent or more of FADA employees. "Successor" is defined in the same terms as anything or anyone effecting a "sale." RTC contends that situations (1) and (2) were effected by FDIC takeover of FADA.

lution] clearly indicates it *was* intended to do.

RTC Memo at 23 n. 10. RTC argues that "in light of these differences, the May 2, 1989 Board Resolution must govern over the May 2, 1989 [management] Addendum." *Id.* The plaintiffs state that they received notice of Policy No. 820 and the management's two addenda in August 1989 but that the board's resolutions were not distributed. RTC Exhibits Tab. 2 at 12–13 (*Aristeguieta* answer to interrogatory 11); *Alley* Facts in Dispute para. 4.

*The Circumstances*

On August 9, 1989, pursuant to passage of FIRREA, all of FADA's capital stock was transferred to the management and control of the FDIC. 12 U.S.C. § 1812(a). RTC asserts that, following this transfer, in December 1989, all 48 plaintiffs, along with 125 other FADA employees, were offered continuing employment at a FDIC or RTC office within 150 miles of their former workplace at salaries more than 85 percent of their FADA salaries, while 76 other FADA employees were paid severance, including some who took work with FDIC but at less than 85 percent of their former pay. In contrast, the 28 *Aristeguieta* plaintiffs and 20 *Alley* plaintiffs contend that they were ordered and coerced to apply to the RTC and FDIC, and that the employment offered them was not comparable. Aristeguieta Facts in Dispute para. 17; Alley Facts in Dispute para. 13, Opp. at 5–6.

However, the plaintiffs admit that 20 of the 28 *Aristeguieta* plaintiffs and 19 of the 20 *Alley* plaintiffs did actually accept and commence jobs with FDIC on January 2, 1990, the day after their last day of work at FADA, at salaries of more than 85 percent of their FADA salaries. paras. 18, 21, 17. The plaintiffs also appear to admit that they did not receive formal written notices of individual job eliminations from FADA, although they contend that a December 31, 1989, memo from FADA's personnel director, which was apparently intended for use as a reference letter, stated that FADA was no longer in existence, and that they were additionally told orally that

their jobs would be eliminated by that date. Plaintiffs also appear to admit that the nine remaining plaintiffs who did not accept FDIC's employment offers were sent formal notices of job elimination *after* they received and declined the offers, and that these people left FADA on January 5, 1990. Further, the plaintiffs do not dispute RTC's contention that 42 FADA employees remained working for FADA until January 24, 1990, and that nine remained until February 2, 1990, except to state that their work was merely "winding up" and not "substantive." As noted, FADA was placed in receivership on February 5, 1990.

*Discussion*

Among the cases RTC relies in support of its ERISA preemption argument, those most in point are *Gilbert v. Burlington Industries, Inc.,* 765 F.2d 320 (2d Cir.1985), *aff'd,* 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986), and its later companion case, *Holland v. Burlington Industries, Inc.,* 772 F.2d 1140 (4th Cir.1985), 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986). In *Gilbert,* a group of plaintiffs who worked for the defendant company in 16 different states sued under state claims to recover severance payments when the defendant sold as a going concern its operations that employed the plaintiffs. Before the sale, the defendant informed the employees that they were not eligible for severance benefits regardless of whether they accepted continued employment with the buyer. All the plaintiffs accepted the continuing job offers and were never unemployed; they nonetheless claimed entitlement to severance under the defendant's policy which provided for payment in event of "involuntary" termination including "job elimination." *Id.* 765 F.2d at 322–23.

In affirming the district court's dismissal of the state law claims, the Court of Appeals for the Second Circuit held that "an unfunded severance pay policy" constitutes an "employee welfare benefit plan" covered by ERISA, 29 U.S.C. § 1002(1)(A) and (B). In so holding, the Court considered the U.S. Department of Labor regulation interpreting Section 1002(1)(B), which provides that

include[d] within the definition of "welfare plan" [are] those plans which provide holiday and severance benefits, **and benefits which are similar (for example, benefits which are in substance severance benefits, although not so characterized).** * * * 29 C.F.R. 2510.3–1(a)(3)(1984).

(emphasis added). *Id.* at 325. This regulatory provision remains unchanged. 29 C.F.R. 2510.3–1(a)(3)(1991). The court further affirmed the finding that plaintiffs' state law claims were preempted by ERISA, observing that

> seeking to enforce the severance pay policy would determine whether any benefits are paid, and directly affect the administration of benefits under the plan. As noted, the plaintiffs here were employed in ... different states. The policy favoring national uniformity in this field, therefore, strongly supports preemption.

*Gilbert,* 765 F.2d at 327. Finally, the Court held that ERISA preempted even in situations in which an employer has never sought to comply with ERISA and wants to use it to avoid potential liability under state law. *Id.* at 328.

■ Having carefully reviewed the FADA "severance" and "retention" plans as set forth above in light of the plaintiffs' pleadings and arguments, the Court finds as a matter of law that FADA's board established these plans to confer severance benefits, or "benefits which are in substance severance benefits, although not so characterized," with the intent—stated in both the June 1998 board resolution and the September 1988 management addendum—to provide "a reasonable opportunity, *with income, to pursue other gainful employment."* [3] Any doubt that the board's intent was *not* to confer a *"reward* to retain the employee base," Aristeguieta Opp. at 3 (emphasis added), or a so-called "golden parachute"—a characterization

with which plaintiffs agreed at oral argument—is dispelled by the board's May 2, 1989, resolution providing that no benefits were to be paid if a successor made a comparable offer of employment. Moreover, the board's June 1988 resolution expressly demonstrates its intent that the plans be established, reported, and administered in compliance with ERISA. That FADA appointed no plan administrator, prepared no plan summary or otherwise complied with ERISA, as plaintiffs contend, is irrelevant to preemption, as *Gilbert* makes clear.

Accordingly, the Court holds that ERISA governs the FADA plans and preempts the plaintiffs' state law actions. The Court rejects plaintiffs' argument that the Supreme Court's decision in *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), is to the contrary, since that decision regards favorably both the *Gilbert* and *Holland* decisions, and since *Fort Halifax* clearly distinguished the situation before it of a *state-mandated* payment to workers affected by plant closings. *See* 482 U.S. at 16–19, 25–26, 107 S.Ct. at 2220–21, 2225.

■ The Court is also unpersuaded by plaintiffs' argument that FADA's plans are exempt from ERISA as governmental plans under 29 U.S.C. § 1003(b)(1) because FADA was a government "instrumentality" within 29 U.S.C. § 1002(32). In making this determination, the Court finds little authority in case law from which to draw guidance. However, after considering the few cases relied upon by the parties, and in light of their acknowledgement that FADA's quasi-governmental status presents an apparently unique question in this regard, the Court is convinced by the numerous reasons provided by RTC why it should not exempt FADA's plans on this basis, *see* RTC Memo at 11–12 and Reply at 7–9,[4] including what we consider to be two

**3.** The *Holland* court observed that "the fact that at least one purpose of the Burlington plan is to provide help for employees during periods of unemployment that follow elimination of their jobs ... brings it within the definition of employee welfare benefit plan in Section 1002(1)(A) and thus within the ambit of ERISA." 772 F.2d at 1145; *accord Gilbert,* 765 F.2d at 325.

**4.** These factors include: (1) FADA used no tax money for operating expenses, but rather used fees charged to private thrift institutions and

pivotal factors: first, that a federal court has previously held a state government-supported entity did not to fall within Section 1002(32), *Krupp v. Lincoln University,* 663 F.Supp. 289, 291–92 (E.D.Pa.1987), and second, that FADA's employees were never subject to government civil service classification or restrictions on salaries, benefits or personnel rules.

For these reasons, the Court grants summary judgment in favor of the defendant and holds that ERISA preempts all of the plaintiffs' claims. Since the plaintiffs' complaints seek no relief under ERISA [5], the Court dismisses these actions pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a cause of action upon which relief can be granted.

---

FSLIC receiverships pursuant to asset management and consulting contracts with those agencies, (2) FADA was created by federal charter entitling it to conduct the business of a federal savings and loan association, (3) FADA was not created pursuant to any special legislative act, (4) FADA was subject to federal and state income taxation and filed returns, and (5) FADA had an independent board of directors, the only voting members of which were private individuals who selected and supervised FADA's officers.

5. In their Memo in Opposition to Summary Judgment, the *Alley* plaintiffs state, without support, that

> [b]ecause Plaintiff's Complaint states a actionable claim for the denial of severance and retention payments, even were this Court to rule that ERISA preempts Plaintiff's state law claims, there is no basis for dismissing the Complaint in its entirety. Rather, factual issues would remain for trial as to Plaintiff's entitlement to recover under ERISA.

Opp. at 7. Any factual issues are wholly irrelevant, however, where plaintiffs have failed to plead ERISA violations in their complaint. At oral argument on February 28, 1992, when asked about the absence of ERISA claims, plaintiffs requested leave to amend their complaint but pointed to no specific ERISA provision under which relief should be granted. To date, plaintiffs have not filed motions to amend, and the Court therefore considers that no ERISA claims are before it.

Were plaintiffs to file ERISA claims, however, a court considering those claims likely would be required to apply the deferential "arbitrary and capricious" standard in reviewing FADA's determinations of severance plan eligibility, *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989) (a denial of benefits challenged under [29 U.S.C.] 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits"). *See* 6–18–88 board resolution, RTC Appendix Tab 4 at 12, and 5–2–89 management addendum, Complaint Exh.A, at 5, regarding conferral of discretion; *see also* 29 U.S.C. § 1002(16)(A)(i) & (ii) ("if an administrator is not [by the terms of the instrument] designated, the plan sponsor" is considered the administrator). Moreover, even if reviewed under a *de novo* standard, the record before the Court, summarized in part above, indicates strongly that the FADA plans were ultimately executed in a manner consistent with the resolutions of FADA's board of directors and perhaps subject to legitimate amendments by RTC's appointed director for oversight/dissolution. *See Friesen v. General Motors Corp.,* 759 F.Supp. 560, 566 (E.D.Mo.1991) ("In a *de novo* review the Court ascertains the plaintiff's eligibility for benefits by looking to the terms of the plan and other manifestations of the parties' intent.") (Citing *Firestone* ).